**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **LEATISHA S. LUCAS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No: 11 C 7456** |
| v. ) | |
| ) | **Magistrate Judge Jeffrey Cole** |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Leatisha Lucas, who did not attend her hearing for reasons unclear from the record, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Ms. Lucas asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision. While we are reversing, the question of Ms. Lucas's unexplained failure to attend the hearing looms large, and should she again not attend the hearing without a showing of good cause, there should be no further review as she will have failed to exhaust administrative remedies. *Van Williams v. Social Security Admin.*, 152 Fed.Appx. 153 (3rd Cir. 2005); *Bush v. Bowen*, 690 F.Supp. 417, 418 (W.D.Pa. 1988).

I.
PROCEDURAL HISTORY

Ms. Lucas applied for disability benefits on March 2, 2007, alleging that she had been disabled since September 5, 2005, due to depression. (Administrative Record ("R.") 195-205). Her application was denied initially and upon reconsideration, and Ms. Lucas requested an administrative hearing. (R. 54-62, 67-74, 80-82). The hearing was postponed a couple of times because Ms. Lucas did not have transportation – Ms. Lucas lived in Elgin and the hearing was in Oak Brook – and was obtaining representation. It was postponed one more time to arrange a consultative examination at the request of Ms. Lucas's attorney. (R. 31-32, 34). When the hearing was finally held, on July 7, 2010, Ms. Lucas did not attend, despite at least two notices. (R. 176, 188). The problem could not have been transportation this time because her attorney went to her home to pick her up, but she was nowhere to be found. (R. 39). Inexplicably, the hearing proceeded with counsel but without Ms. Lucas and testimony from Dr. Kathleen O'Brien, a medical expert, and Glee Ann Kehr, a vocational expert. (R. 36-53). On August 5, 2010, the ALJ issued a decision finding that Ms. Lucas was not disabled because she did not have a severe impairment. (R. 14-20). This became the final decision of the Commissioner when the Appeals Council denied Ms. Lucas' request for review of the decision on September 7, 2011. (R. 1-4). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Lucas has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Ms. Lucas was born on May 27, 1977, making her thirty-three years old at the time of the ALJ's decision. (R. 195). She made it through the eleventh grade. (R. 240). She has held several short-lived jobs – home care, fast food, temp agency work – but from 1998 to December 2006, she was paid by the state to take care of her sister's children. (R. 236). She says her childcare days came to an end because she was told to stop until she had a mental health evaluation. (R. 235).

### B.
### The Medical Evidence

The medical record in this case is rather scant. Ms. Lucas went to her community health clinic on November 2, 2006, and reported that she was depressed, agitated, anxious, and sad. She was losing sleep and nervous about her financial situation. (R. 310). She used alcohol and drugs when she was depressed. (R. 311). Examination revealed that her affect, speech, thought process, and attention were all within normal limits. Her memory and judgment were good; her intelligence was average. (R. 311). The diagnosis was depression and anxiety, and Ms. Lucas was assigned a Global

3

Assessment of Functioning score of just 43.[1] A pysch evaluation and counseling were recommended. (R. 312).

Ms. Lucas returned to the clinic on January 30, 2007. She said she was "going through a lot of stress." She was isolative and suffering from insomnia. (R. 319). She recounted that she had been hospitalized at age 14 after taking pills. She had a depressed affect, but thought process and content were normal. Attention was "distractible", recent memory was poor, remote memory was fair. Judgment and insight were fair. She exhibited suicidal and homicidal ideation. (R. 320). The diagnosis this time was major depressive disorder and the GAF score was 58. (R. 320). Ms. Lucas was started on Lexapro. (R. 320).

On March 20, 2007, Ms. Lucas reported that she was "stressing a lot." Her affect was depressed. Her thought process, content, and attention were all within normal limits. (R. 318). Memory, judgment, and insight were fair. There was no suicidal or homicidal ideation. (R. 318). She was continued on Lexapro. (R. 318).

The disability agency arranged for Ms. Lucas to have a consultative physical examination on May 8, 2007, with Dr. Scott Kale. Ms. Lucas denied using drugs or alcohol. (R. 333). She recounted that she had been stabbed in the chest at age 14, and

---

[1] "A GAF between 41 and 50 indicates 'Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shop-lifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).' In turn, a GAF between 51 and 60 reflects "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" *Jelinek v. Astrue*, 662 F.3d 805, 807 (7th Cir. 2011)(quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM–IV–TR) 34 (4th ed. 2000)).

occasionally experience some residual pain there. (R. 333-34). She had no shortness of breath or wheezing. Her only other physical complaint was occasional right knee pain stemming from a work injury. But she denied any limping, leg collapse, swelling. (R. 334). Physical examination was normal, with the exception of slight limitation of motion in the lower back. (R. 334).

Dr. Kelly Johnson performed a psychiatric examination that same day at the same offices. Ms. Lucas explained that she became depressed in 2002 when her mother died. She complained of frequent crying spells and difficulty sleeping, as well as irritability and mood swings. She had decreased energy and appetite. (R. 337). Ms. Lucas allowed that she did use alcohol when depressed, but denied using drugs. She avoided contact with other people. She said that her right knee made it difficult for her to ambulate freely. (R. 338). The doctor said that Ms. Lucas appeared tearful and had a restricted affect. (R. 338). Ms. Lucas denied any suicidal ideation or hallucinations. She did express some paranoia and fear of other people. She could remember only two of three objects after several minutes. She was able to recount the last 24 hours of her life. She knew who the current president was. She could not perform serial sevens, but she did exhibit some capacity for abstract thinking. Dr. Johnson felt she met the criteria for ongoing major depressive disorder. (R. 339).

Psychologist Kirk Boyenga reviewed the psychological evidence file on behalf of the disability agency on May 29, 2007. He noted depression with anhedonia, psychomotor agitation, decreased energy, and difficulty concentrating or thinking. (R. 344). He noted a history of post traumatic stress disorder and thought the evidence was

conflicting with regard to substance abuse. (R. 346, 349). Ms. Lucas's impairment resulted in a moderate restriction of daily activities, moderate difficulties with social functioning, and mild limitations in concentration. (R. 351). Dr. Richard Bilinsky reviewed the physical impairment evidence and concluded that Ms. Lucas's physical impairments were not severe. (R. 355). Dr. Francis Vincent and psychologist Jerold Heinrich hen reviewed the file and concurred with both earlier reviews. (R. 361).

The record also demonstrates that Ms. Lucas failed to attend her counseling sessions a number of times, resulting in the community center dropping her case and closing her file. (R. 363-64).

Ms. Lucas had one more consultative examination – on February 19, 2010 with psychologist Michael Stone. Ms. Lucas told her she had been stabbed in the lung in the past but had never had a psychiatric hospitalization. She denied problematic use of drugs or alcohol. (R. 393). Ms. Lucas allowed that she had been incarcerated in the past for assault and battery. (R. 394). She was taking Seroquel (antipsychotic medication), Lexapro (antidepressant), Ranitidine (stomach acid), Citralopram (antidepressant), and Naproxen (NSAID). (R. 393). During the examination, Ms. Lucas was tense and irritable, but did not exhibit manic symptoms typical of bipolar disorder. (R. 394). Affect was depressed and agitated. She related feelings of hopelessness, anhedonia, and helplessness. Thought content was positive for depression, but there was no suicidal ideation, hallucinations, or paranoid ideation. Ms. Lucas's thought process was normal but she could not maintain attention and concentration consistently throughout the examination. Memory was somewhat impaired. She had trouble with abstract thinking.

Simple calculations were difficult for her. Judgment was impaired. (R. 395-96). Ms. Lucas's symptoms were indicative of depression, agitation, anxiety, and impulse control disorder. Her prognosis was guarded and she would be unable to manage any benefits she might receive on her own. (R., 396-97). Ms. Lucas would be moderately impaired in her ability to interact with the public, co-workers, and supervisor, and respond to changes in a work setting. (R. 399).

## C.
## The Administrative Hearing Testimony

As already noted, Ms. Lucas did not attend her hearing. The hearing commenced with testimony from psychologist Kathleen O'Brien, the medical expert ("ME"). The ME noted diagnoses of agitated depression and anxiety, and impulse control and panic disorder by self-report. (R. 41). Ms. Lucas's impairments did not meet or equal a listing. In fact, based on the three visits to the clinic, the ME felt they were non-severe. (R. 41). Relying on the notes from Ms. Lucas's initial visit to the clinic in November 2006, the ME concluded that Ms. Lucas had no problems with social interaction and that her concentration was only mildly impaired. The ME indicated that the notes reported she used alcohol and marijuana on weekends, and noted that Ms. Lucas sometimes reported that she did not. (R. 41). The ME felt there were no limitations on Ms. Lucas's mental residual functional capacity. (R. 41-42).

The ME did not put much stock in the diagnoses of depression in the record because they were based on self-report. If Ms. Lucas's condition were severe, the psychologists would have seen her more often. (R. 44). In reaching her impressions, the ME relied on the three clinical visits rather than the consultative exams. (R. 44-45). The

7

ME added that GAF scores "were really not to be used in these proceedings because they are so highly unreliable . . . . when you have someone who comes in and says they have severe financial problems and family problems, the GAF goes down automatically." (R. 45).

Next, Glee Ann Kehr testified as a vocational expert ("VE"). She characterized Ms. Lucas's past work as a baby-sitter as light and semi-skilled. The ALJ asked the VE whether a person who could have no contact with the public at work and only occasional contact with co-workers and supervisors could perform that work. (R. 47). The VE said no, but such a person could do jobs like blade assembly, production assembly, machine operator, and inspector. (R. 47-48). A person who was limited to unskilled, repetitive tasks could perform the same jobs. (R. 48).

### D.
### The ALJ's Decision

The ALJ determined that Ms. Lucas did not have an impairment or combination of impairments that has significantly limited her ability to perform basic work activities. (R. 17). She noted there were no medical records contemporaneous with Ms. Lucas's alleged onset date of September 5, 2005; treatment records began in November 2006. The ALJ summarized the medical evidence, noting that there was only a brief window of treatment. She noted that Ms. Lucas missed several appointments and was dropped for noncompliance. She added that there was little in the consultative exam of February 2010 that supported a diagnosis of depression other than Ms. Lucas's complaints. (R. 17-18). There was even less evidence of any physical problems. The ALJ relied on the ME's testimony to determine that Ms. Lucas's mental impairment was not severe. The

ALJ added that Ms. Lucas had a capacity for a broad range of daily activities including child care. (R. 18). She noted that Ms. Lucas operated a childcare business in the past and was able to interact with others. (R. 18). The ALJ concluded that Ms. Lucas's impairments, singly or in combination, did not significantly impair her ability to perform basic work activities. (R 19). Accordingly, the ALJ found that Ms. Lucas did not have a severe impairment and was not disabled under the Act. (R. 19-20).

## IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010)(*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833,

841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

## B.
## Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997). The ALJ concluded her analysis here at step two, determining that Ms. Lucas did not have a severe impairment.

## C.
## Analysis

This is a difficult case. The medical record is sparse and Ms. Lucas has not exactly been religious in seeking treatment. Still, diagnoses have been consistent throughout and psychiatrists have not been shy about prescribing her anti-depressant and antipsychotic medication. And, because she never testified at her hearing, we don't know why Ms. Lucas missed her counseling appointments. Worse, this case raises the specters of two of the Seventh Circuit's abiding themes, the logical bridge, *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012), and the ALJs' lack of understanding of mental illness. *See Martinez v. Astrue*, 630 F.3d 693, 694 (7th Cir. 2011).

Quite frankly, the ALJ's ultimate conclusion may well be right and Ms. Lucas is capable of working. The problem is that the ALJ found she does not have a severe

11

impairment. The severe impairment hurdle is not a high one. An impairment or combination of impairments is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities include, among other things: walking, standing, sitting, lifting, pushing, reaching, carrying, handling; understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

An impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered . . . ." Social Security Ruling ("SSR") 85-28, 1985 WL 56856, *3; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). So here, the ALJ found that Ms. Lucas's depression was a slight abnormality, with no more than a minimal effect on her capacity for work.

There is much evidence that suggests otherwise. The November 2006 report assigned Ms. Lucas a GAF score of just 43, denoting *serious* symptoms or *serious* impairment in functioning. The January 2007 examination revealed Ms. Lucas to be impaired in her attention, memory, and judgment. Her GAF score indicated *moderate* symptoms or *moderate* impairment of functioning. She also exhibited suicidal and homicidal ideation. Dr. Johnson, who examined Ms. Lucas for the disability agency

found her to be tearful, with a restricted affect and some impairment in her functioning and memory. Dr. Johnson felt she had a *major* depressive disorder that was chronic and *severe*. Both agency psychologists who reviewed Ms. Lucas's file found her to have a severe impairment that resulted in moderate restrictions of daily activity and social functioning. And, finally, Dr. Stone, who examined Ms. Lucas on behalf of the disability agency, noted that his examination was positive for depression, and that Ms. Lucas suffered impairments to her attention and concentration, abstract thinking, and judgment. He felt she would be *moderately* impaired in a work setting. He also indicated her prognosis was guarded and that she wouldn't even be capable of handling her own funds if she were granted benefits.

The upshot of all this is not a single source, whether treating or consultative or reviewing, gave any indication that Ms. Lucas's depression was merely a slight abnormality with only a minimal effect on her functioning. The outlier among all the psychiatrists and psychologists was psychologist Kathleen O'Brien, the ME who never even met Ms. Lucas. For Dr. O'Brien, all these reports could be summarily discarded because they were based on Ms. Lucas's self reports. She felt that Ms. Lucas had no severe impairment, and she didn't even think there was any basis for a diagnosis of depression. This was the opinion the ALJ based her decision on, and she essentially adopted Dr. O'Brien's rationale for discrediting the findings of the reports from psychiatrists and psychologists. When an ALJ disregards such opinions, she must provide good reasons for doing so. *Martinez v. Astrue,* 630 F.3d 693, 698 (7th Cir.2011); *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir.2011); *Larson v. Astrue,* 615 F.3d 744, 749

(7th Cir.2010). Dr. O'Brien's reasoning was faulty and, consequently, so was the ALJ's,

It's unclear how the ME – or the ALJ – would have wanted all these mental health professionals to have gone about their examinations of Ms. Lucas. While it is true that *Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir.2008) holds that a medical opinion may be rejected if it is based entirely on a claimant's subjective complaints, this rule is most often applicable in cases involving physical impairments. There are no MRIs or x-rays to confirm diagnoses of depression. Mental health professionals rely on information elicited from patients, along with observation. There is testing – for judgment, attention, abstract thinking, etc. – and the mental health professionals in this case all employed some form of that. If that is still inadequate, then nearly every file in every Social Security disability case involving psychological examinations is inadequate.

Curiously, Dr. O'Brien stated that "there's no indication that [Ms. Lucas sought or required any treatment for [her depression]." (R. 44). That's just wrong. Ms. Lucas was prescribed and takes at least two, if not more, types of medication for her mental impairment. The mental health professional also felt she needed counseling and, while she was not compliant with their recommendation – we don't know why – one cannot say she did not need treatment. Moreover, if the types of examination performed here are, as Dr. O'Brien suggests, inadequate to provide a basis for diagnosing depression, then there has been a great deal of unethical or perhaps illegal dispensing of drugs in this case and countless others, and for no apparent reason. *Cf. Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004)(improbable that claimant would undergo treatment with narcotics if she was not experiencing pain). To credit Ms. O'Brien's opinion is to say that

14

psychiatrists write prescriptions for no reason at all. That's far too great a leap. The ME's opinion simply cannot be credited.

Dr. O'Brien also said she had no use for GAF scores and they could not be used in Social Security disability cases. That too is wrong as the Seventh Circuit has held. *See Blevins v. Astrue*, 451 Fed.Appx. 583, 585, 2011 WL 6118571, 2 (7th Cir. 2011)(approving ALJ's consideration of GAF scores); *Walters v. Astrue*, 444 Fed.Appx. 913, 918, 2011 WL 5024149, 4 (7th Cir. 2011)(ALJ erred by not discussing all GAF scores); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)(ALJ discussed conflict between GAF score and other findings); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)(ALJ erred by failing to discuss GAF score). Based on Seventh Circuit case law – which trumps Dr. O'Brien's thoughts here – an ALJ cannot simply ignore GAF scores, especially if they undermine her conclusion. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012); *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010); *Simila v. Astrue,* 573 F.3d 503, 516 (7th Cir. 2009). The GAF scores here do, and the ALJ made no mention of them.

In short, the ALJ's decision in this case rises and falls with the credence one assigns to Dr. O'Brien's opinion, and that opinion is too flawed to constitute substantial evidence to support the ALJ's decision. The case must be remanded. Lest the wrong impression be given, this is not a walkover for Ms. Lucas. While the record supports a conclusion that she has a severe impairment, that does not mean that she is disabled. Far from it. As the VE's testimony indicated, she could be impaired in certain areas of

functioning and still be perfectly capable of performing work that exists in significant numbers in the regional economy.

The ALJ did not make a credibility finding here, perhaps because Ms. Lucas wasn't at her hearing. The ALJ should demand that she attend the next hearing so that she may be cross examined and her demeanor observed by the ALJ. Social Security proceedings are not exempt from the fundamental principle that in determining credibility demeanor can play a critical role. *Oakes v. Astrue*, 258 Fed.Appx. 38, 43 (7th Cir. 2007). *See also Ramey v. Astrue*, 319 Fed.Appx. 426, 428 (7th Cir. 2009); *Gaylor v. Astrue*, 292 Fed.Appx. 506, 515 (7th Cir. 2008). And, of course, cross examination is the "'greatest legal engine ever invented for the discovery of truth.'" *Lilly v. Virginia*, 527U.S. 116, 124 (1999); *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1048-49 (7th Cir. 2003).

The ALJ said that Ms. Lucas had no restrictions in her daily activities. It is not clear where this came from, as Ms. Lucas did not testified as to her activity. In her written statement, Ms. Lucas said that her medication kept her sleepy all day, and she had difficulty getting out of bed. She had trouble focusing. She was unable to cook, do housework, or take care of her children – her sister had to help her. (R. 269). Such activities – or lack thereof – are certainly consistent with *at least* a severe mental impairment. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013)("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."); *Carradine*, 360 F.3d at 756 ("[ALJ] failed to consider the difference

between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week.").

Also, the ALJ pointed to Ms. Lucas being able to operate a childcare business as evidence that her impairment was not severe. But, she wasn't running a business; she was babysitting her sister's children as part of a state-funded workfare program. It is doubtful whether that could be considered a competitive work environment, and it certainly doesn't equate to running a daycare facility. And, contrary to the ALJ's characterization, it did not require Ms. Lucas to "interact[] regularly with others" (R. 19) aside from her immediate family.

That being said, on remand, Ms. Lucas does have some potential problems with her credibility. Perhaps that is why she failed to attend the hearing. She did lie about her onset date, and she does not seem to have a consistent answer as to whether she uses drugs and/or alcohol or how often. While she sought medication and renewed her prescriptions, she did not follow through with counseling. This service was free, so impecunity cannot have been the excuse. *Cf. Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012)("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference."); *Lopez v. Astrue*, 807 F.Supp.2d 750 (N.D.Ill. 2011). But these are matters for remand.

Finally, the ALJ should insist on Ms. Lucas's attendance. Failure to attend the hearing without good cause ought to preclude further judicial review. *Davenport v. Astrue*, 417 Fed.Appx. 544 (7th Cir. 2011). *See also* cases cited *supra* at 1.

## CONCLUSION

The plaintiff's motion for summary judgment or remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 7/30/13